# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs June 3, 2025

## IN RE KENNA R., ET AL.

**Appeal from the Juvenile Court for Hawkins County**
**No. HJ-22-0437     William Erwin Phillips, II, Judge**

---

### No. E2024-00181-COA-R3-PT

---

This appeal concerns termination of parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Hawkins County ("the Juvenile Court") seeking to terminate the parental rights of Rikiya P. ("Mother") to her minor children Annabelle, Jasmine, and Liam ("the Children," collectively), as well as the parental rights of Daniel R. ("Father") to Liam.[1] The Children had been removed from Mother and Father's custody because Mother starved and beat Kenna, Father's daughter by another mother.[2] Father was aware of the abuse but failed to protect Kenna. The Juvenile Court terminated Mother's and Father's parental rights on the ground of severe child abuse. Mother and Father appeal. We find, as did the Juvenile Court, that the ground of severe child abuse was proven against Mother and Father by clear and convincing evidence. We find further, as did the Juvenile Court, that clear and convincing evidence supports termination of Mother's and Father's parental rights as being in the best interest of the Children. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

---

[1] Aaron P. is the father of Annabelle and Jasmine. Aaron P.'s parental rights were terminated, and he appealed. Subsequently, counsel for Aaron P. filed a motion in this Court seeking dismissal of the appeal based on his client's lack of participation. We granted the motion and dismissed this appeal as to Aaron P. In this Opinion, we address only Mother's and Father's parental rights. We mention Aaron P. only as necessary to set out the factual background. In addition, as this is a parental rights case, we refrain from using the full names of children and their relatives.

[2] Kenna has since reached majority age.

Nicholas S. Davenport, V, Kingsport, Tennessee, for the appellant, Rikiya P.

Emily C. Morley, Rogersville, Tennessee, for the appellant, Daniel R.[3]

Jonathan Skrmetti, Attorney General and Reporter, and Mara L. Cunningham, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

## OPINION

## Background

Mother is the mother of Annabelle, born May 2013; Jasmine, born June 2014; and Liam, born December 2019. Aaron P. is the father of Annabelle and Jasmine. Father is the father of Liam. Father has an older daughter, Kenna, by another mother. At the inception of this case, Mother, Father, Aaron P., the Children, and Kenna all lived under the same roof. In May 2021, Kenna, then age sixteen, tried to run away. A neighbor stopped Kenna and returned her. Law enforcement later performed a welfare check but did not see Kenna. That night, law enforcement returned. Mother and Father told the officers that Kenna was away visiting a relative. That was false. Law enforcement found Kenna hiding under a bed. She was bruised, emaciated, and had a shaved head. Afterward, the Children and Kenna were removed into state custody. DCS filed a petition for dependency and neglect, but it was never adjudicated.

On May 25, 2022, DCS filed a petition seeking to terminate Mother's and Father's parental rights to their respective children. Kenna has since reached majority age. DCS proceeded against Mother and Father on the ground of severe child abuse. Trial on DCS's petition was on November 29, November 30, and December 1, 2023. We proceed to review the pertinent testimony from trial. Both Mother and Father declined to testify, invoking their rights under the Fifth Amendment to the United States Constitution.

Dr. Andrew Steven Wilt ("Dr. Wilt"), an expert witness and the doctor who treated Kenna after her removal, testified by deposition. Kenna suffered from "severe malnutrition." Kenna's weight for her age was less than the bottom first percentile, as was her body mass index. Dr. Wilt said it was most medically reasonable that Kenna's malnutrition was not due to anything Kenna had done to herself but was the result of her being denied enough food. Kenna weighed 83 pounds when she was admitted to the hospital. Kenna had shown signs of "refeeding syndrome," in which a malnourished person does not properly handle the reintroduction of proper nutrients, which in turn can

---

[3] Father's previous attorney, Gerald T. Eidson, submitted Father's appellate brief.

lead to death. In addition to starvation, Kenna showed signs of having been abused physically, including facial bruising; a subconjunctival hemorrhage (a bleed in the white part of one's eye); bruises on her back; and bruises on her scapula. Kenna told Dr. Wilt that Mother had hit her with a broom and a dustpan. Kenna also reported that she had lived under strict rules about eating and drinking. For breakfast, she tended to have pack of oatmeal. She was allowed to eat ramen or Chef Boyardee for lunch and dinner. Despite these meager offerings, Kenna remained hungry. When the home ran out of oatmeal, she was given a protein drink instead. Dr. Wilt testified that Kenna's malnourishment was such that it was likely to cause severe bodily injury or death. In Dr. Wilt's view, a reasonably prudent medical professional who saw Kenna in the condition she was in would have made a referral.

Lisa Hawryluk ("Hawryluk"), a DCS caseworker, took the stand to testify. Father told Hawryluk that Kenna had done this to them, and he did not want her back in his home. Mother likewise blamed Kenna. The thrust of Mother's and Father's positions was that the family's problems were brought about by Kenna's bad behavior, not their parenting. Hawryluk said that Kenna, now out of the family home, was glad to drink something besides water and consumed whatever was given to her. On cross-examination, Hawryluk acknowledged that the Children appeared clean and did not have any marks visible.

Retired detective Jeff Greer ("Greer") testified. Greer saw Kenna at Mother's and Father's home in her malnourished state. Kenna appeared "very emaciated" to Greer. She was bruised around one eye and her head. According to Greer, the other children did not look emaciated. Father told Greer that Kenna "really didn't eat," but admitted they used food as a punishment. Mother, in turn, told Greer that Kenna refused to eat. Corporal Anthony Crosby ("Crosby") of the Hawkins County Sheriff's Department testified, as well. Crosby said that Kenna looked "severely abused." She had a black eye and looked like she was "literally starving to death."

Constance Cole ("Cole"), a former DCS worker, testified next. Cole previously worked on the Children's case. Cole said that the Children were placed in a home together while Kenna was placed in a separate home. Cole acknowledged that Mother and Father have a parental attachment to the Children but said that it is not of a healthy kind. Annabelle broke down and cried at the first parental visitation. Cole said that she did not believe this was due to Annabelle missing her parents. In fact, Annabelle said that she was scared because "they beated me." However, Cole acknowledged that some of the visits went well. Visitation remained supervised. Annabelle and Jasmine told Cole that they were fearful of returning home. Annabelle and Jasmine said that the parents had been mean to Kenna. With respect to positive steps taken by Mother and Father, Cole testified that they had housing and jobs. They also underwent parenting classes. All the same, in Cole's view, the Children should be freed for adoption. Cole explained why this was her view:

The abuse that Kenna received while in their care. I would be afraid that other children would face that same abuse and the older they get they would face the same abuse and it was horrific. Every time I met with Kenna she was vibrant and I never saw the things that were described to me by the Defendants in her. I never saw the attitudes or any of that in her. I saw a thriving young lady. I would be fearful for the other children.

School counselor Jason Floyd ("Floyd") testified. Regarding Annabelle and Jasmine, Floyd said: "On a couple occasions separately and every now and again they would want to come in together. They would say they are starving us and not giving us any food. When I would ask questions to explore that further they wouldn't say anything else." Floyd said that Annabelle was very anxious early on, and Jasmine exhibited disruptive behaviors. In addition, Tracy Burke ("Burke"), a CASA volunteer who worked with the Children, testified. Annabelle told Burke that Mother pulled her hair, slapped her in the face or legs, and withheld food from her. Even still, Annabelle said that this was "nothing like what they had seen done to Kenna." Annabelle also reported that Father once pulled a gun on Kenna.

Larissa J., Kenna's foster mother, testified.[4] Kenna came to live with Larissa J. in May 2021. According to Larissa J., Kenna initially looked "very frail and skinny." Kenna's head was shaved, and she had a lot of bruises. When Kenna came to live with Larissa J., she ate regularly. Kenna then weighed between 80 and 90 pounds. Since then, she has risen to around 140 pounds. Larissa J. enrolled Kenna in school. Kenna did not have any high school credits when she was enrolled. Nevertheless, Kenna has since graduated and has a job.

Kenna testified next. Kenna, age 19 at trial, is Father's daughter. Kenna was asked to describe a typical day in Mother and Father's home. According to Kenna, she woke up "super early," went to the living room to sit all day, and then went to bed. Mother made Kenna sit on the floor in a certain precise way as a form of punishment. If Kenna failed to do so, Mother hit her or yelled at her. Kenna needed permission to use the restroom. Otherwise, an alarm went off signaling that she could go. Kenna had no television or computer. For breakfast, she had one bowl of plain oatmeal. This was not by Kenna's choice. For lunch, she was allowed to have canned soup or Chef Boyardee. It was not heated; she had to eat it out of the can. Dinner was the same. If Kenna asked for more, Mother yelled at her. Kenna could drink only water. Meanwhile, cameras monitored Kenna in the home. Kenna testified that Father threatened her with a gun twice. Kenna was asked if Father ever tried to protect her from Mother. Kenna said that Father did "a

---

[4] Larissa J.'s first name is spelled Larisa in some parts of the record.

-4-

couple of times," but he told her it was not for her benefit, but to protect Mother from getting in trouble.

On cross-examination, Kenna said that her own mother left her when she was a year or a year-and-a-half old, and Mother was at one time a mother figure to her. Asked why she did not climb out of her bedroom window to find food, Kenna said that the window was screwed shut. Kenna acknowledged certain correspondence in which she admitted to being stubborn. Kenna also said that Mother was "just a typical mom" to Annabelle and Jasmine.

Mike Smith ("Smith"), the Children's DCS case manager, testified. Smith said that the Children are doing well in foster care. Jasmine and Annabelle were two years behind in school, based on their prior lack of education. However, they have made significant improvements. Regarding the Children's attachment to Mother and Father, Smith testified:

> Q. Would you be able to tell the Court if you believe there is a secure and healthy parental attachment between these children and the parents?
> A. This is a difficult situation. Annabelle and Jasmine both have disclosed that they both don't want to have any contact with their mother. There are certainly concerns there. They both have disclosed that they love their father and they would like to see their father. I have seen an attachment there in those visits. Liam due to his age obviously he recognizes his mother and father. He likes seeing them and he is excited to see them. The question I have wondered about with the attachment factor with Liam and generally when I see a two or three year old at the end of visits whenever there is some kind of separation from the visits a child will normally scream, cry, it is usually a traumatic experience to separate the child from the visit. We never have that issue with Liam. He is happy to go. He is happy to come and happy to go. That has always been an odd situation.

Smith testified that while Father was engaged during the visits, Mother tended to use her phone on the couch. Smith acknowledged that Mother and Father paid child support. Asked if Mother or Father had undergone a mental health intake, Smith said:

> There is some question with that. I have requested documentation. It is not to my liking but it is to her credit, [Mother] has sent me a screen shot of a piece of paper from her therapist, but as far as ongoing or what is being discussed in therapy, I don't have any knowledge of it. [Father] has reported that he is going to Camelot. I haven't had any verification from that. I think it was Camelot and I may be mistaken as far as the provider but he has reported that he is receiving therapy. . . .

At a February 2023 visit, Jasmine locked herself in a bathroom crying that Mother abused them. Jasmine threatened to kill herself. She also threatened to stab Mother if she had to see her again. After this incident, Jasmine spent a week in the hospital. Mother's visits with Annabelle and Jasmine were suspended.

Next at trial, Mother's and Father's employer testified favorably about Mother and Father. In addition, Mother's mother, Pamela P., testified favorably about Mother and Father, as well. Pamela P. testified, in effect, that Kenna's bad behavior was the problem in the household, not Mother's and Father's parenting. When confronted with photographs of Kenna, Pamela P. testified:

Q. You stated that you left in March, 2021, is that correct?
A. That's correct.
Q. Can you look at this picture and see if that is how Kenna looked when you left?
A. Well, she has her pick marks. I was not here for this picture and that timing exactly. I have seen her have injuries before from nobody being at home.
THE COURT: She asked you if that is how she looked when you left?
A. When I last saw her?
THE COURT: Yes.
A. No. She was thin and she had pick marks but, no, I didn't see this.
THE COURT: Thank you.
Q. Same thing. Did she look like this when you left? Is that her haircut that she had when you left?
A. No, Ma'am, but it is the haircut she described that she wanted.
Q. Oh, it is?
A. Yes.
Q. Okay, that is what she said she wanted her hair to look like?
A. Yes, Ma'am.
Q. Okay, thank you. Did she have black eyes when you last saw her and is that an injury she would have inflicted upon herself?
A. Twice. One time she had one black eye and the second time she had two and no one was there all day. She didn't expect to see me.
Q. Did you ask her about her injuries?
A. Oh, I had an accident and she would go hide in her room.
Q. Are you aware that both Annabelle and Jasmine have made statements that they also had food restrictions in the home of your daughter?
A. I am not aware but I know better.
Q. You don't believe the children are saying that?

A. I believe I have broken children that never got the help they wanted and they could be coerced in any way.

Q. You believe these children are being coerced?

A. Yes, Ma'am.

Q. What evidence do you have of them being coerced?

A. What evidence do I have?

Q. Yes.

A. I can't state because it is evidenced presented through other people.

Q. You can't state?

THE COURT: You can answer her question, Ma'am.

A. Why do I think so because other people have told me and I know the kids are broken and I have been told in the past that they are in fear of everything going on and they can be coerced. I know they always had plenty of food.

In January 2024, the Juvenile Court entered its final order in which it terminated Mother's parental rights to the Children and Father's parental rights to Liam. The Juvenile Court found, by clear and convincing evidence, that the ground of severe child abuse had been proven against both Mother and Father. The Juvenile Court also found that clear and convincing evidence supported termination of Mother's and Father's parental rights as being in the Children's best interest. The Juvenile Court specifically found Kenna to be a credible witness. The Juvenile Court also credited the testimony of witnesses Hawryluk, Greer, Crosby, Larissa J., Cole, Floyd, Burke, and Smith. By contrast, the Juvenile Court specifically found the testimony of Mother's mother, Pamela P., in which she blamed Kenna for the family's situation, not credible. In its detailed Memorandum Opinion incorporated into its termination order, the Juvenile Court found, in relevant part:

On May 17, 2021, Kenna was 16 years old, and had been living . . . with her father, two other adults, and three younger children. When law enforcement discovered Kenna under [Aaron P.'s] bed they knew immediately from her appearance and condition that she needed medical attention. Kenna looked emaciated, as if she was "starving to death." She had bruising on her face and head, and she had a bizarre haircut.

Kenna was transported by ambulance to Hawkins County Memorial Hospital, and then to Johnson City Medical Center, where law enforcement's observations were confirmed. When Kenna arrived at JCMC she appeared visibly dirty, malnourished and bruised. Her appearance was described by Dr. Wilt as "wasted or cachectic." Her ribs were visible, and her hips and spine were protruding. In addition to the bruising on her face and head, she had bruising down her back and on her shoulder blades. Upon admission, Kenna was approximately 5' 6" tall, and weighed 83 pounds. Kenna was diagnosed as being severely malnourished due to caloric restriction by the

caregivers in her home.  Her malnourishment was so severe that her life was at risk from refeeding syndrome.  Even in the face of Kenna's wasted appearance, and her obvious need for immediate medical care, Respondents could not recall the last time she had seen a doctor and did not seek medical help.

Kenna has also consistently recounted her physical and emotional abuse at the hands of Respondents: from being beaten by [Mother]; to being threatened with a hand gun by [Father]; to having her sense of femininity sheared away by [Aaron P.].  It is evident to the Court that all three respondents actively participated in her systematic starvation, and in her extreme isolation.  This evidence was uncontested at trial, and the Court finds by a preponderance of the evidence that Kenna suffered from abuse and neglect.

***

Kenna suffered no burns at the hands of Respondents.  No evidence was presented at trial that Kenna suffered any broken bones, or a concussion.  The Court does find, however, that being struck in the head by [Mother] with her fists and a broom was *likely to cause* a broken nose or concussion.  No evidence was introduced that the child suffered subdural bleeding, cerebral edema, or a brain contusion.  Upon her admission to JCMC, Kenna did have a subconjunctival hemorrhage.  Kenna did have deeply disturbing bruising on her face and head, and along her spinal column and across her shoulders.  While Kenna was defeminized by her forced haircut, it did not result in permanent or protracted disfigurement.  Kenna did report that [Mother] had hit her with a broom, a bowl, and a belt.  Still, Kenna's wasted condition does not quite fit squarely within any of the abhorrent injuries specifically detailed in the statutory definition.  The Court's analysis of the "severe bodily injury" element, however, does not end there.

While the statutory definition of "serious bodily injury" includes specific examples, it is "not limited to" those listed examples.  Our Supreme Court has held that the words "includes, but not limited to" are terms of enlargement, not terms of restriction.  *See* Lovlace v Copley, 418 S.W.3d 1, 18 (Tenn. 2013).  This language allows a court to employ its aforementioned common sense to determine whether an injury suffered by a child can reasonably be defined as a serious bodily injury.  As such, the Court finds that any reasonable person would conclude that a child who is so severely malnourished that she requires hospitalization and medically monitored nourishment, has sustained a serious bodily injury.  Accordingly, the Court

finds by a preponderance of the evidence that the abuse and neglect suffered by Kenna was likely to cause serious bodily injury.

Likewise, the Court finds by a preponderance of the evidence that the abuse and neglect suffered by Kenna was likely to cause death. Kenna's malnourishment was so severe that she exhibited signs of refeeding syndrome, which poses a severe risk of death. Dr. Wilt testified unequivocally that Kenna's severe malnourishment was likely to cause severe bodily injury or death.

\*\*\*

Perhaps the most damning evidence of Respondents' knowing exposure of Kenna to severe abuse is the fact that they tried to hide her from the authorities. When a Sheriff's deputy first responded to the residence for a welfare check, [Aaron P.] told Kenna to hide under his bed, and told law enforcement she was not there. When authorities returned to the residence, Kenna was again told to hide under [Aaron P.'s] bed, and [Mother] and [Father] lied about Kenna's whereabouts. Respondents' actions clearly betray a consciousness of guilt. They knew that Kenna's discovery by authorities would reveal the abuse they had inflicted on her. The Court, therefore, finds by clear and convincing evidence that [Father], [Mother], and [Aaron P.] each knowingly exposed Kenna to abuse or neglect likely to cause severe bodily injury or death.

Furthermore, the Court finds by clear and convincing evidence that [Father] and [Mother] used force on Kenna likely to cause serious bodily injury or death. As discussed above, [Mother] used her hands and objects, such as a broom, to strike Kenna in the face and head. This force was likely to cause a broken bone or concussion. Additionally, the uncontradicted evidence at trial was that [Father] twice threatened Kenna with a gun; on one occasion pointing a loaded gun at her forehead and stating, "I want to shoot you." There is no doubt in the Court's mind that this behavior constitutes a use of force likely to result in serious bodily injury or death.

\*\*\*

The Court, having addressed the underlying facts and elements of the statutory ground of severe child abuse, must now address the ground itself. "Once these specific underlying facts are established by a preponderance of the evidence, the court must step back to look at the combined weight of all of those facts, to see if they clearly and convincingly show severe child abuse." Id. at 457 *quoting* In re S.J., 387 S.W.3d 576, 591-592 (Tenn. App.

-9-

2012). The Court finds that the Department has proved by clear and convincing evidence that each of [Father], [Mother], and [Aaron P.] have committed severe child abuse as defined in Tenn. Code Ann. § 37-1-102.

\*\*\*

[Best Interest]

**(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority.** None of the children are currently in an adoptive placement. The children have also been removed from Respondents' custody for more than two and a half years. Respondents' therapeutic visitation has never been increased. In fact, [Mother's] and [Aaron P.'s] visitation was suspended at the time of trial. There has never been a trial home placement, or even unsupervised visitation. Considering that Respondents' case for a return of custody has not advanced at all in more than two and a half years, the instant termination of their parental rights will free the children for adoption and perhaps facilitate a pre-adoptive placement. This factor weighs in favor of the termination of Respondents' parental rights.

**(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition.** A return of Jasmine and Annabelle to the custody of [Mother] and/or [Aaron P.] would have a negative effect on their emotional and psychological condition. Both girls were present in the home when Kenna was being severely abused. Jasmine witnessed her mother pulling Kenna's hair, and Kenna screaming. She witnessed her mother yelling at Kenna to sit correctly. Annabelle also witnessed the severe abuse of Kenna. She described scary events, and recounted her own maltreatment. At the prospect of a visit with her parents, Jasmine threatened to hurt herself and her mother, resulting in her admission to Woodridge Psychiatric Hospital. Annabelle did not want to visit with her parents, and has been diagnosed with post-traumatic stress disorder. All of these facts were uncontradicted by [Mother] and [Aaron P.] at trial. Accordingly, this factor weighs in favor of the termination of [Mother's] and [Aaron P.'s] rights to Annabelle and Jasmine.

There was no evidence presented at trial regarding Liam's emotional, psychological, or medical condition, likely due to his young age. The Court is unable to make a factual finding regarding what effect a change of caretakers would have on Liam. This factor weighs neither in favor of nor against the termination of [Father's] or [Mother's] parental rights to Liam.

-10-

**(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs.** Respondents have not had a meaningful opportunity to meet these needs in more than two and a half years. Of course, the children's removal was the result of Respondents' own actions. The evidence is undisputed that at the time of their removal, the children subject to this petition appeared well. They did not appear malnourished; they were not bruised like Kenna. The evidence is also undisputed that prior to their removal they were allegedly being home schooled with a curriculum not accredited in Tennessee, and that they were educationally behind. It is equally undisputed that when in Respondents' custody, the children lived in a home of casual violence and abuse. A home in which adults assault, threaten and abuse one child does not meet the safety needs of any child. This factor weighs in favor of termination of all Respondents' parental rights.

**(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment.** As already discussed, the evidence presented at trial clearly establishes that neither [Mother] nor [Aaron P.] have a secure and healthy parental attachment with Jasmine or Annabelle. Moreover, neither [Mother] nor [Aaron P.] testified regarding their attachment with, or love for, their children, or how they expect to recreate that relationship. There was simply no evidence introduced at trial that would allow the Court to conclude that there is a reasonable expectation that [Mother] or [Aaron P.] can create a healthy parental attachment with Annabelle or Jasmine. The undisputed evidence suggests the opposite.

At the time of trial, Liam was nearly four years old. He has been removed from his father's and mother's custody for significantly more than half his young life. Again, neither [Father] nor [Mother] elected to testify regarding their parental attachment with or love for Liam, or how they hope to create such attachment. This factor weighs in favor of the termination of all Respondents' parental rights.

**(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child.** The evidence at trial establishes that, when available, Respondents regularly attended therapeutic visitation with the children, and that Respondents behavior during the visits was largely appropriate. [Mother's] and [Aaron P.'s] visitation was suspended in 2023, though the suspension does not appear to have resulted from their behavior *at the visit*. As of trial, [Father] was still attending visits with Liam.

-11-

With regard to [Mother] and [Aaron P.], this factor weighs neither in favor of nor against termination. With regard to [Father], this factor weighs against termination.

**(F) Whether the child is fearful of living in the parent's home.** The evidence presented at trial is clear and undisputed that Jasmine and Annabelle are fearful of their parents. Jasmine was so fearful of a visit that she credibly threated [sic] to hurt herself and her mother, requiring her admission to a psychiatric hospital. Annabelle has consistently maintained that she does not want to see her parents, and she has been diagnosed with post-traumatic stress disorder. While [Father] is not the father of Jasmine or Annabelle, the Court has no doubt their fear also extends to him. There was no evidence introduced at trial that Liam was in fear of his parents.

With regard to [Mother's] and [Aaron P.'s] rights to Jasmine and Annabelle, this factor weighs heavily in favor of termination. With regard to [Mother's] and [Father's] rights to Liam, this factor weighs neither in favor of nor against termination.

**(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms.** Much as in the previous factor, the evidence introduced at trial is clear and undisputed that Jasmine and Annabelle are terrified of all Respondents. There is simply no question that Respondents trigger and exacerbate the girls' experience of trauma and post-traumatic symptoms. The Court does not have to speculate, as there is undisputed evidence of this actually happening. Again, there was no evidence presented at trial that would allow the Court to make this same conclusion with regard to Liam.

With regard to [Mother's] and [Aaron P.'s] rights to Jasmine and Annabelle, this factor weighs heavily in favor of termination. With regard to [Mother's] and [Father's] rights to Liam, this factor weighs neither in favor of nor against termination.

**(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent.** The children are not in a pre-adoptive home. There was no evidence introduced at trial that the children had developed a healthy parental attachment with another person who is still involved in their care in the absence of the parent. The children had become attached with their initial foster parent who had hoped to adopt them, but due to the development of a serious illness was no longer able to care for them. Still, the children do not have a healthy attachment with Respondents. This factor weighs neither in favor of nor against termination of Respondents' parental rights.

-12-

**(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage.** Liam, Jasmine, and Annabelle have been placed together since their removal from Respondents more than two and a half years ago. There is direct evidence that Jasmine and Annabelle rely on their relationship for comfort and safety. Their school counsellor, Mr. Floyd, testified that the children would want to meet with him together. Annabelle scolds her CAC interviewer that she and Jasmine could have been interviewed together. It is evident to the Court that this sibling relationship is paramount, and is essential to the best interest of all three children. Indeed, their relationship with each other has been the only constant in their lives. This factor weighs heavily in favor of the Court's decision being uniform for all three children.

**(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner.** No evidence was presented that Respondents had issues with substance abuse. There was testimony that Respondents had largely completed the actions steps set forth for them by the Department. There was some dispute as to whether Respondents had completed a mental health assessment. Of course, Respondents could have addressed this question had they elected to testify. They could have also introduced confirming documentation. They did neither. More importantly, Respondents did not testify that they had made a lasting adjustment regarding their abusive conduct, or even deny that such conduct ever happened. There is simply no evidence that allows the Court to conclude, in the face of undisputed evidence that Respondents severely abused Kenna, that the children would be safe in their parents' home. This factor weighs in favor of termination of Respondents' parental rights.

**(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions.** The Court's assessment of this factor mirrors that of factor (J). While Respondents largely completed the action steps set forth by the Department, no documentary evidence was submitted as an exhibit, and there was no testimony that Respondents have made a lasting adjustment to their abusive conduct which resulted in the removal of the children from their custody.

-13-

The undisputed testimony at trial was that Respondents refused to accept responsibility for their abuse of Kenna. This factor weighs in favor of termination of Respondent's parental rights.

**(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department.** The Court cannot conclude from the evidence presented at trial that the Department made reasonable efforts to assist Respondents in making a lasting adjustment that would allow the return of the children. This factor weighs against termination of Respondents' parental rights.

**(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest.** No evidence was presented at trial that Respondents demonstrated a sense of urgency in regaining custody of the children, or in addressing the undisputed abuse of Kenna which led to the removal of the children in the first place. Respondents did not testify regarding any steps they had taken to regain custody of the children. The undisputed testimony at trial was that Respondents refused to accept responsibility for their abuse of Kenna. This factor weighs in favor of terminating Respondents' parental rights.

**(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult.** This Court has found by clear and convincing evidence that each of [Father], [Mother], and [Aaron P.] severely abused Kenna. This factor weighs heavily in favor of terminating Respondents' parental rights.

**(O) Whether the parent has ever provided safe and stable care for the child or any other child.** Liam, Jasmine, and Annabelle resided in a home in which Respondents were severely abusing another child. Jasmine and Annabelle were twice removed from the custody of [Mother] and [Aaron P.] before their current removal. The Court simply cannot find that the children were ever provided safe and stable care by Respondents. This factor weighs in favor of terminating Respondents' parental rights.

**(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive.** No evidence was presented at trial that Respondents demonstrated an understanding of the basic and specific needs required for the children to thrive. The undisputed evidence is that Respondents provided a home in which severe abuse was

-14-

occurring, which has resulted in lasting trauma to Annabelle and Jasmine. This factor weighs in favor of terminating Respondents' parental rights.

**(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive.** No evidence was presented at trial that Respondents demonstrated the ability and commitment to creating a home that meets the children's basic and specific needs and in which the children can thrive. The undisputed evidence is that Respondents provided a home in which severe abuse was occurring, which has resulted in lasting trauma to Annabelle and Jasmine. This factor weighs in favor of terminating Respondents' parental rights.

**(R) Whether the physical environment of the parent's home is healthy and safe for the child.** There was no testimony or other evidence introduced at trial regarding the physical environment of any of Respondents' current homes. This factor weighs neither in favor of nor against termination.

**(S) Whether the parent has consistently provided more than token financial support for the child.** The undisputed testimony at trial was that Respondents paid their child support. The amount of support was not identified. This factor weighs against termination.

**(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.** The Court has found by clear and convincing evidence that each of [Father], [Mother], and [Aaron P.] committed severe child abuse against Kenna. The *undisputed* evidence supports this finding. Respondents did not deny the abuse; they did not accept responsibility for their conduct. They did not address how things have changed. They did not address the trauma suffered by Annabelle and Jasmine. This factor weighs heavily in favor of terminating Respondents' parental rights.

This Court acknowledges, and truly believes, that not all parental misconduct is irredeemable. In re Audrey S., 182 S.W.3d 838, 877 (Tenn. App. 2005). But knowing full well what is at stake, Respondents declined to dispute the overwhelming evidence that they severely abused a child; declined to accept any responsibility for Kenna's wasted condition and the trauma suffered by Annabelle and Jasmine; and declined to tell the Court what steps they have taken to redeem themselves. This Court has no choice but to conclude by clear and convincing evidence that the termination of Respondents' parental rights is in the best interest of the children.

(Footnote omitted). Mother and Father timely appealed to this Court.

## Discussion

We restate and consolidate Mother's issues into the following dispositive issues: 1) whether the Juvenile Court erred in finding the ground of severe child abuse against Mother and 2) whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Children's best interest. Father does not challenge the ground for termination found against him but raises an issue as to Liam's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[5] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and

---

[5] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

obligations of the parent or guardian of the child."  Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable").  In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence.  *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388.  This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights.  *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).  "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings."  *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof.  Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[6] for termination exists and

---

[6] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[7] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

---

[7] Tenn. Code Ann. § 36-1-113(i).

-18-

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Although Father does not challenge the ground for termination found against him, we must review it anyway. *In re Carrington H.*, 483 S.W.3d at 511 ("[A]ppellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal.").

We first address Mother's issues, beginning with whether the Juvenile Court erred in finding the ground of severe child abuse against her. On May 25, 2022, when DCS filed its petition, the ground of severe child abuse read as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

***

-19-

(4) The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

Tenn. Code Ann. § 36-1-113(g)(4) (West July 1, 2021 to June 30, 2022).

As relevant, Tenn. Code Ann. § 37-1-102 provides:

(27) "Severe child abuse" means:
(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
(ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(c)[.]

Tenn. Code Ann. § 37-1-102(b)(27)(A) (West July 1, 2021 to June 30, 2022).  Regarding what "knowing" conduct consists of in the context of severe child abuse, our Supreme Court has held:

[F]or severe child abuse, a person's conduct is considered "knowing," and a person is deemed to "knowingly" act or fail to act, when he actually knows of relevant facts, circumstances or information, or when he is either in deliberate ignorance of or in reckless disregard of such facts, circumstances, or information presented to him.  Under this standard, the relevant facts, circumstances, or information would alert a reasonable parent to take affirmative action to protect the child.  For deliberate ignorance, a parent can be found to have acted knowingly when he has specific reason to know the relevant facts, circumstances, or information but deliberately ignores them.  For reckless disregard, if the parent has been presented with the relevant facts, circumstances, or information and recklessly disregards them, the parent's failure to protect can be considered knowing.

*In re Markus E.*, 671 S.W.3d 437, 444 (Tenn. 2023).

Meanwhile, Tenn. Code Ann. § 39-15-402 provides, as relevant:

(c) "Serious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or

-20-

subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects and acts of female genital mutilation as defined in § 39-13-110.

Tenn. Code Ann. § 39-15-402(c) (West eff. July 1, 2019).

Mother challenges the Juvenile Court's findings that she committed severe child abuse. She asserts that, while the Juvenile Court focused on Kenna's risk for "refeeding syndrome," refeeding syndrome was not an abusive act by Mother but simply a result of increasing caloric intake to a malnourished person. Mother argues further that there was no basis for the Juvenile Court's finding that Mother's striking Kenna with her fists or a broom were likely to cause a broken nose or a concussion.

The Juvenile Court made detailed factual findings regarding Mother's abusive acts toward Kenna. The evidence does not preponderate against the Juvenile Court's factual findings. Furthermore, the Juvenile Court credited Kenna's testimony, including her account of suffering at Mother's hands. We defer to a trial court's credibility determination absent clear and convincing evidence to the contrary. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014). This record contains no clear and convincing evidence that would serve to overturn the Juvenile Court's credibility determinations regarding Kenna or any of the other witnesses.

The record reveals that Mother brutally abused Kenna by starving and beating her. Mother's emphasis on refeeding syndrome misses the forest for the trees. Had Mother not starved Kenna in the first place, Kenna would not have been at risk for refeeding syndrome. Mother's abusive acts led to Kenna becoming gravely malnourished. This Court has previously recognized malnourishment as a basis for sustaining the ground of severe child abuse. *See In re Keara J.*, 376 S.W.3d 86, 98 (Tenn. Ct. App. 2012) ("[W]e conclude that the evidence overwhelmingly establishes Keara as a severely abused child who was suffering the effects of knowing nutritional and physical neglect in her parents' care."). Here, Mother purposefully deprived Kenna of sufficient food, leading to Kenna becoming severely emaciated. Dr. Wilt testified that Kenna's condition was such that she faced likely starvation or death, had it continued. Had it not been for the intervention of law enforcement, Kenna might well have died of starvation thanks to Mother. Mother's starvation of Kenna constituted severe child abuse under any definition of the term.

Mother also takes issue with the Juvenile Court's findings regarding her beatings of Kenna. The Juvenile Court found that, while Kenna had not suffered any broken bones or a concussion, "being struck in the head by [Mother] with her fists and a broom was *likely to cause* a broken nose or concussion." Mother contends that this finding has no basis. We

disagree. The Juvenile Court's findings reflect the common sense understanding that an adult repeatedly striking a child in the face with fists and/or various hard objects is likely to cause that child to have a broken nose or concussion. Mother's actions toward Kenna went far beyond any legitimate discipline and fell squarely into the statutory definition of acts likely to cause serious bodily injury.

As a final point on this issue, Mother argues strenuously that since Kenna was not her child, she should not be held to the duties of a parent or guardian. Mother's argument is without merit. The ground for parental rights at issue, (g)(4), provides for termination when "[t]he parent or guardian has been found to have committed severe child abuse . . . against any child[.]" Tenn. Code Ann. § 36-1-113(g)(4) (West July 1, 2021 to June 30, 2022) (emphasis added). Thus, it does not matter that Kenna was not Mother's child. The General Assembly has decided that inflicting severe abuse on any child, not only one's biological or legal child, will sustain the ground of severe child abuse. We find, as did the Juvenile Court, that the ground of severe child abuse was proven against Mother by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Children's best interest. On May 25, 2022, when DCS filed its petition, the best interest factors read as follows:

> (i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:
> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
> (C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
> (D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
> (E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
> (F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West July 1, 2021 to June 30, 2022).

Mother argues that the Juvenile Court erred in its best interest analysis. According to Mother, she "has not had a meaningful opportunity to meet the needs of her children in more than two and a half years" because DCS took the Children from her. Mother says it was wrong for the Juvenile Court to hold this separation against her because it presumes that she did what she was accused of doing. Mother also points out that, despite Kenna's condition, the Children appeared to have been properly fed and were not bruised. In essence, Mother argues that, regardless of what she may have done to Kenna, the Children were fine in her care. Mother also says that the Juvenile Court wrongly held her decision not to testify against her.

Implicit to Mother's argument is that she merely is alleged to have abused Kenna. However, a bench trial has been held in this matter. The Juvenile Court found that Mother committed severe child abuse against Kenna based upon its findings that Mother starved and beat Kenna. We have found nothing in the record to overturn the Juvenile Court's factual findings. On the contrary, the record fully supports the Juvenile Court's findings. Mother's abuse of Kenna no longer is a mere allegation—it is an adjudicated fact. It was Mother's abusive actions that led to the Children's removal and her separation from them. Mother's severe abuse of Kenna, and subsequent failure to take responsibility for it, is the weightiest factor in this matter. Regarding Mother's argument that the Children appeared normal despite Kenna's condition, that is both insufficient and misleading. The Children were in the same household where Mother's brutality and violence against Kenna unfolded. Annabelle and Jasmine required therapy and fell behind educationally. While the Children may not have been subjected to the same horrors that Mother inflicted on Kenna, they were nevertheless exposed to a climate of abuse and fear. Thus, it is inaccurate to suggest that the Children somehow led normal lives notwithstanding what Mother did to Kenna. It was appropriate for the Juvenile Court to consider Mother's severe abuse of Kenna in

-24-

concluding that the Children were at risk of facing similar abuse should they be returned to Mother's care. There is no hint that Mother understands the severity of what she did to Kenna or even that what she did to Kenna was wrong. Finally, regarding Mother's assertion that the Juvenile Court held her refusal to testify against her, we find that not to be the case. The Juvenile Court did not punish Mother for declining to testify. It merely noted that Mother could have shed more light on certain factors had she chosen to testify. That was a correct observation by the Juvenile Court. Mother chose not to testify, and the Juvenile Court was by necessity limited to the evidence adduced from other sources. In sum, the Juvenile Court made detailed findings as to each applicable best interest factor. The evidence does not preponderate against the Juvenile Court's detailed findings. We find by clear and convincing evidence, as did the Juvenile Court, that termination of Mother's parental rights is in the Children's best interest. We affirm the Juvenile Court's judgment terminating Mother's parental rights to the Children.

We next address Father's parental rights to Liam. Father does not contest the ground of severe child abuse found against him. All the same, under our Supreme Court's holding in *In re Carrington H.*, we are required to address it. The Juvenile Court made detailed findings regarding Father's role in the severe abuse suffered by Kenna. Father stood by while his daughter was starved and suffered beatings at Mother's hands. Father even pointed a gun at Kenna on occasion. The evidence does not preponderate against the Juvenile Court's detailed findings. We find, as did the Juvenile Court, that the ground of severe child abuse was proven against Father by clear and convincing evidence.

The final issue we address is whether the Juvenile Court erred in finding that termination of Father's parental rights is in Liam's best interest. On this issue, Father makes several contentions as to why he believes the Juvenile Court erred in its best interest analysis. Father states that he has appropriate housing; that he is employed; that he completed a parenting assessment; that he completed an alcohol and drug program; that his visits with Liam were appropriate; that he has completed the tasks required of him; and that Liam liked seeing him on visits. According to Father, the Juvenile Court did not give enough weight to these positives in its analysis.

Father is correct in that he did certain positive things during the custodial period. The Juvenile Court recognized as much in its order. For example, the Juvenile Court found that the factor concerning visitation weighed against terminating Father's parental rights to Liam. The record reflects that Liam was happy to see Father on visits. By the same measure, however, the record reflects that Liam is happy in general. In any event, the Juvenile Court did not utterly discount Father's positive acts. Even still, hinging upon "the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017) (quoting *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)).

Under the circumstances of this case, severe child abuse is the paramount concern. Father stood by while his daughter Kenna was starved and beaten by Mother. Father even contributed to the abuse by pointing a gun at Kenna on occasion. There is no hint that Father has ever taken responsibility for the brutality Kenna endured. Instead, Father blamed Kenna. Father's severe abuse of Kenna, and subsequent failure to take responsibility for it, outweighs his positive actions and poses the real risk that Liam could suffer similar abuse in Father's care. In sum, the Juvenile Court made detailed findings as to each applicable best interest factor. The evidence does not preponderate against the Juvenile Court's detailed findings. We find by clear and convincing evidence, as did the Juvenile Court, that termination of Father's parental rights is in Liam's best interest. We affirm the Juvenile Court's judgment terminating Father's parental rights to Liam.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed 50% to the Appellant, Rikiya P., and 50% to the Appellant, Daniel R., and their surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE